2024 IL App (1st) 221729

No. 1-22-1729

Opinion filed January 12, 2024

Sixth Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE VILLAGE OF ARLINGTON HEIGHTS, | ) ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 2022 CH 001229 |
| THE CITY OF ROLLING MEADOWS, | ) ) ) | The Honorable |
| Defendant-Appellee. | ) ) ) | Thaddeus L. Wilson, Judge, presiding. |

JUSTICE HYMAN delivered the judgment of the court, with opinion.
Justice C.A. Walker concurred in the judgment and opinion.
Presiding Justice Oden Johnson dissented, with opinion.

**OPINION**

¶ 1   Two neighboring municipalities dispute whether over $1 million of sales tax revenue that the Department of Revenue (IDOR) collected and paid for more than eight years to the wrong party can be recovered by its rightful payee.

¶ 2   For years, IDOR sent sales tax revenue to the City of Rolling Meadows (Rolling Meadows) for a restaurant in the Village of Arlington Heights (Arlington Heights). When Arlington Heights notified IDOR of the error, IDOR reimbursed Arlington Heights the misallocated

revenue from the prior six-month period, about $109,000, the maximum allowable under section 8-11-16 of the Illinois Municipal Code (65 ILCS 5/8-11-16 (West 2020)). When Rolling Meadows refused to return the remaining misallocated revenue, over $1 million, Arlington Heights sought a declaration for all the sales tax from the restaurant that should have gone to it. Arlington Heights also sought relief for unjust enrichment and conversion.

¶ 3 Rolling Meadows moved to dismiss, arguing (i) jurisdiction was solely vested in IDOR, (ii) the statute of limitations barred the claim, and (iii) the doctrine of nonliability applied. The trial court granted the motion and dismissed the complaint with prejudice. The trial court found that under our supreme court's holding in *City of Chicago v. City of Kankakee*, 2019 IL 122878, the IDOR had exclusive jurisdiction over Arlington Heights's claims. Alternatively, the trial court dismissed Arlington Heights's claim for declaratory relief under the doctrine of nonliability, which bars a declaratory action for past conduct. The court denied Rolling Meadows's statute of limitations argument.

¶ 4 We disagree with the trial court's finding that *City of Chicago* controls. Unlike this case, *City of Chicago*, which was limited to its facts, involved a complex use tax dispute. The court found that because use taxes from thousands of transactions over more than a decade had to be calculated and redistributed to multiple government entities, IDOR expertise was required. Conversely, Arlington Heights's claims are straightforward; one municipality accepted sales tax, the amount of which can easily be determined, that another municipality should have received. As we held in *Village of Itasca v. Village of Lisle*, 352 Ill. App. 3d 847 (2004), which our supreme court favorably cited in *City of Chicago*, a trial court has jurisdiction involving straightforward sales tax disputes that do not require agency expertise. Further, the doctrine of

nonliability does not apply because the conduct—Rolling Meadows's retention of misdirected sales tax revenue—was ongoing. We reverse and remand for further proceedings.

¶ 5                                                Background

¶ 6                                          Sales Tax vs. Use Tax

¶ 7        Under the Retailers' Occupation Tax Act (ROTA), the State levies a sales tax on retail sales of merchandise. 35 ILCS 120/1 *et seq.* (West 2020). Businesses collect sales tax and send it to IDOR, which then allocates a portion monthly to the municipality where the sales occur. Annually, IDOR sends municipalities a list of all registered retail businesses within their boundaries and provides monthly updates showing additions or deletions. Conversely, use tax under the Use Tax Act (35 ILCS 105/1 *et seq.* (West 2020)) deals with the sale of personal property used in Illinois but purchased from an out-of-state retailer by the Internet, telephone, or mail. *Id.* § 3. The use tax aims " 'primarily to prevent avoidance of [the sales] tax by people making out-of-State purchases, and to protect Illinois merchants against such diversion of business to retailers outside Illinois.' " *Performance Marketing Ass'n v. Hamer*, 2013 IL 114496, ¶ 3 (quoting *Klein Town Builders, Inc. v. Department of Revenue*, 36 Ill. 2d 301, 303, 222 N.E.2d 482 (1966)).

¶ 8        The general rate set for both sales and use tax is 6.25% of the item's sale price, with 5% allocated to the State. 35 ILCS 105/3-10 (West 2020); 35 ILCS 120/2-10 (West 2020); 30 ILCS 105/6z-18 (West 2020). Under ROTA, the remaining 1.25% goes to the municipality (1%) and county (0.25%) where the sale of the item actually occurred. 30 ILCS 105/6z-18 (West 2020). As *City of Chicago* explained, the distribution of funds under Use Tax Act is more complicated: "Unlike the local share of sales tax, which is distributed entirely where the sale takes place, under UTA, the remaining 1.25% share of the use tax is distributed in the following

percentages: 20% of the fund goes to Chicago, 10% to the Regional Transportation Authority Occupation and Use Tax Replacement Fund (RTA Fund), 0.6% to the Madison County Mass Transit District, and $3.15 million to the Build Illinois Fund. The balance of the fund is distributed to all other municipalities (except Chicago) based on their proportionate share of the state population. *Id.* § 6z-17. Consequently, a municipality receives a larger amount from a local sale subject to the sales tax than from a comparable sale subject to the use tax." *City of Chicago*, 2019 IL 122878 ¶ 5.

¶ 9                                      Arlington Height's Sales Tax Claims

¶ 10        Arlington Heights's claims against Rolling Meadows only involve sales taxes. Cooper's Hawk Winery and Restaurant (Cooper's Hawk) opened in Arlington Heights in June 2011. The IDOR mistakenly believed the restaurant was located in Rolling Meadows. (The parties disagree as to whether Rolling Meadows knew of the error. Arlington Heights asserts that Rolling Meadows failed to respond to a letter from IDOR asking for verification that Cooper's Hawk was located in that city. IDOR took the lack of a response as confirmation. Rolling Meadows contends no evidence indicates it received IDOR's letter or intentionally disregarded it.) Nonetheless, the parties agree that IDOR thought the restaurant was in Rolling Meadows, coded it that way in its system, and sent sales tax revenue the restaurant generated to the wrong municipality for more than eight years, totaling over $1.1 million.

¶ 11        When Arlington Heights discovered the error in March 2020, it notified IDOR. According to IDOR, section 8-11-16 of the Municipal Code sets at the previous six months the maximum allowable reimbursement it can make "from the time a misallocation is discovered." 65 ILCS 5/8-11-16 (West 2020). IDOR reimbursed Arlington Heights for the period from July 2019 through December 2019, about $109,000. IDOR also notified the parties it had "corrected the

location code so that the business would be correctly coded to Arlington Heights moving forward."

¶ 12     When Rolling Meadows refused to return the misallocated sales taxes, Arlington Heights filed a three-count verified complaint (i) to declare Arlington Heights entitled to the misallocated sales tax, (ii) to enter a judgment against Rolling Meadows for the amount of the misallocated sales tax plus statutory interest, and (iii) to direct that Rolling Meadows immediately return Arlington Heights the entire amount of misallocated sales tax plus statutory interest. Arlington Heights also brought claims alleging unjust enrichment and conversion, seeking the return of the misallocated funds and asking for a constructive trust to receive those funds.

¶ 13     Rolling Meadows filed a combined motion to dismiss under section 2-619.1 of the Code of Civil Procedure (Code) (735 ILCS 5/2-619.1 (West 2020)), arguing the verified complaint should be dismissed because (i) it fails to state a claim for which relief can be granted, (ii) the trial court lacked subject matter jurisdiction under the holding of *City of Chicago*, (iii) the five-year statute of limitations in section 13-205 barred the claims, (iv) Arlington Heights received all of the relief to which the Act entitles it, namely, an offset refund disbursement for the statutorily created lookback period, and (v) the doctrine of nonliability precluded recovery.

¶ 14     After a hearing, the trial court granted the motion, in part, and dismissed the verified complaint with prejudice. The trial court held it lacked subject matter jurisdiction to adjudicate Arlington Height's claims, relying on *City of Chicago* as having settled the issue. Alternatively, the trial court found the doctrine of nonliability germane because Arlington Heights's declaratory judgment claim involved already occurred conduct. See *Adkins Energy, LLC v. Delta-T Corp.*, 347 Ill. App. 3d 373, 378 (2004) ("[t]he doctrine of nonliability for past conduct

bars an action for declaratory judgment when the conduct that makes a party liable, that is, amenable to suit, has already occurred"). The court did not specify what that conduct was. At the pleadings stage, the trial court could not determine whether the statute of limitations pertained to Arlington Heights's claims and denied that part of the motion to dismiss.

¶ 15    Arlington Heights appeals, arguing that the trial court had subject matter jurisdiction or else the doctrine of nonliability permitted its declaratory relief claim to proceed. Rolling Meadows did not cross-appeal the denial of the motion to dismiss on statute of limitations grounds.

¶ 16                                          Analysis

¶ 17                                    Standard of Review

¶ 18    Section 2-619.1 combines sections 2-615 and 2-619 of the Code. See 735 ILCS 5/2-615, 2-619, 2-619.1 (West 2020). "A motion to dismiss under section 2-615(a) of the Code (735 ILCS 5/2-615(a) (West [2020])) tests the legal sufficiency of the complaint, whereas a motion to dismiss under section 2-619(a) of the Code (735 ILCS 5/2-619(a) (West [2020])) admits the legal sufficiency of the complaint, but asserts affirmative matter outside the complaint that defeats the cause of action." *Kean v. Wal-Mart Stores, Inc.*, 235 Ill. 2d 351, 361 (2009). In reviewing a dismissal under sections 2-615 and 2-619, "we accept all well-pleaded facts in the complaint as true and draw all reasonable inferences from those facts in favor of the nonmoving party." *Dopkeen v. Whitaker*, 399 Ill. App. 3d 682, 684 (2010). Dismissal under either section occurs where a party alleges no set of facts entitling relief. *Id.* We review the judgment on a section 2-619.1 motion *de novo*. *Gatreaux v. DKW Enterprises, LLC*, 2011 IL App (1st) 103482, ¶ 10.

¶ 19                                Subject Matter Jurisdiction

¶ 20    Arlington Heights contends the trial court erred in finding that *City of Chicago* disposes of the question of subject matter jurisdiction, as that case is substantially distinguishable on its facts. Instead, Arlington Heights urges us to follow this court's holding in *Village of Itasca* as analogous and having been favorably cited in *City of Chicago*. In response, Rolling Meadows asserts (i) the trial court lacked jurisdiction under the holding of the *City of Chicago*, (ii) the legislature limited Arlington Heights's remedy to the six months before the discovery of the error under section 8-11-16 of the Municipal Code, and (iii) the legislature has broad discretion in this area and courts cannot rewrite legislation to conform to notions of "orderliness or public policy."

¶ 21    *City of Chicago v. City of Kankakee*

¶ 22    In *City of Chicago*, the plaintiffs, including the City of Chicago and other municipalities, sued the City of Kankakee (Kankakee) and the City of Channahon (Channahon), alleging they were unjustly enriched through a "use sale tax swap" scheme that deprived plaintiffs of their statutory share of Illinois use tax. *City of Chicago*, 2019 IL 122878 ¶ 8. Specifically, plaintiffs alleged that defendants had rebate agreements to return a portion of sales taxes to a retailer that would list the defendants as the site of a sale even though little or no sales activity took place in the offices in those cities. *Id.* ¶¶ 8-9. By reporting that the sales took place in Kankakee and Channahon, they were subjected to sales tax rather than use tax, permitting those two cities to retain a higher amount. *Id.* ¶ 9. Plaintiffs sought a constructive trust on all sales tax revenue received by Kankakee and Channahon due to the rebate agreements, equaling the amount of use tax revenue the plaintiffs had been wrongfully deprived. *Id.* ¶ 10.

¶ 23    The trial court dismissed the complaint with prejudice finding, in part, that IDOR had exclusive jurisdiction over tax distribution cases. *Id.* ¶ 12-13. Our supreme court agreed. In

explaining the differences between sales tax and use tax and how a "use sales tax swap" worked to benefit the defendants, the court detailed the powers the legislature vested in IDOR under ROTA and Use Tax Act and the "more complicated" calculation required for use taxes, noting that "[t]o resolve plaintiffs' claims, the circuit court would have to determine the proper tax situs of thousands of *** retail sales stretching back at least 14 years. If plaintiffs prevailed on liability, the circuit court would then have to determine the amount of tax revenues plaintiffs would have received on each of the applicable transactions had the Internet retailers reported use tax rather than sales tax to IDOR." *Id.* ¶ 41. The court disagreed with plaintiffs' assertion that this complicated "determination falls within the conventional competence of the courts and requires mere arithmetic calculations." *Id.* Further, the circuit court would have to redistribute tax revenue collected under Use Tax Act to local governing bodies who are not parties to the case, which the State Finance Act (30 ILCS 105/1 *et seq.* (West 2020)) places within the exclusive jurisdiction of IDOR. *City of Chicago*, 2019 IL 122878, ¶ 42.

¶ 24 The court further held that "section 8-11-21(a) of the Municipal Code (65 ILCS 5/8-11-21(a) (West 2016)) supports our determination that the circuit court lacks subject-matter jurisdiction to consider plaintiffs' claims. This section allows a municipality that has been denied sales tax revenue because of a rebate agreement in violation of the Municipal Code to file an action in the circuit court against only the offending municipality." (Emphasis omitted.) *Id.* ¶ 43. Because "[n]o similar provision authorizes suits for the denial of use tax revenue due to alleged misreporting," IDOR had exclusive jurisdiction. *Id.* ¶ 44-45.

¶ 25 The trial court and the dissent rely on this language in finding the court lacked jurisdiction because Arlington Heights "has failed to plead that the missourced sales taxes at issue here were the result of a rebate agreement entered into after June 1, 2004." But that interpretation

seriously misreads both the court's decision and the statute. (The parties disagree as to whether this part of the court's opinion is *dicta*. We need not address that question, because as discussed below, *City of Chicago* is distinguishable and limited to its facts, so its discussion of rebate agreements is not relevant to our holding.)

¶ 26     Section 8-11-21(a) prohibits municipalities from entering into certain types of tax sharing or rebate agreements with retailers after June 1, 2004, and permits a municipality denied sales tax revenue by reason of an agreement to "file an action in the circuit court against only the offending municipality." *Id.* ¶ 43. The statute says nothing about a municipality suing another municipality in circuit court absent a rebate program. And contrary to the dissent's contention, merely because the legislature provided circuit courts with jurisdiction over disputes involving tax rebate agreements does not preclude the circuit court from exercising jurisdiction over other dispute involving misallocated sales tax. As the dissent notes, the absence of explicit language divesting jurisdiction is not dispositive (*J&J Ventures Gaming, LLC v. Wild, Inc.*, 2016 IL 119870 ¶ 24), but it also does not strip the court of jurisdiction.

¶ 27     Further, this court's decision in *Village of Itasca* refutes the argument that subject matter jurisdiction does not exist. In *Village of Itasca*, the Village of Itasca sued the Village of Lisle to recover sales tax revenue generated by a company that falsely claimed it had moved from Itasca to Lisle. The trial court dismissed the complaint, in part, because it found the IDOR, not the court, had jurisdiction. *Village of Itasca*, 352 Ill. App. 3d at 850.

¶ 28     In reversing, the appellate court held (i) the legislature did not give the IDOR exclusive jurisdiction regarding sales tax issues and (ii) the doctrine of primary jurisdiction applied. The appellate court concluded the trial court had jurisdiction because "the regulations used for

determining the proper tax site of a sale are straightforward and do not require agency expertise for their interpretation." *Id.* at 855.

¶ 29    In *City of Chicago*, our supreme court agreed with the trial court that *Village of Itasca* was distinguishable because it (i) involved taxes other than the use tax, (ii) concerned a considerably simpler fact pattern, and (iii) sought relief available without resorting to the IDOR. The supreme court noted that *Village of Itasca* entailed "the proper situs of sales tax between two municipalities." *City of Chicago*, 2019 IL 122878, ¶ 27. Contrasting the complaints, the supreme court asserted that the *Village of Itasca* complaint did not concern "the proper distribution of use taxes over a multiyear period, impacting multiple municipalities and other entities that receive a proportionate share of use tax receipts." *Id.* Simply put, our supreme court acknowledged *Village of Itasca* but concluded the factual differences did not "inform" the court's decision. *Id.*

¶ 30    Moreover, Rolling Meadows's contention that *City of Chicago* applies broadly to deprive the trial court of jurisdiction is belied by the supreme court's own language that it was addressing whether the circuit court had jurisdiction "to determine the proper tax situs of thousands of pre-*Hartney* retail sales stretching back at least 14 years" or whether that complex determination falls under the exclusive authority of IDOR. *Id.* ¶¶ 21, 41. The court limited its holding to those facts, and we disagree that it applies generally to all other tax disputes between municipalities. We also disagree with the dissent's contention that *City of Chicago* "declined to extend *Village of Itasca*, where the issue would not arise again." *Infra* ¶ 41. As noted, *City of Chicago* involved a complex redistribution of use tax. Thus, the court had no reason to extend *Village of Itasca*, which involved repayment of sales taxes and was plainly distinguished on the facts.

¶ 31        As in *Village of Itasca* (and unlike *City of Chicago*), this dispute involves "the proper situs of sales tax between two municipalities" and potential repayment of an easily ascertainable amount to the correct municipality and not complicated redistribution of use taxes among multiple government entities, including nonparties, which, as noted, is within IDOR's exclusive jurisdiction. See *City of Chicago*, 2019 IL 122878 ¶ 42. The amount can be readily calculated if Arlington Heights can prove that Rolling Meadows improperly retained sales tax generated by the Cooper's Hawk restaurant. Contrary to the dissent's contention, the circuit court need not do anything it does not regularly do in similar cases involving conversion or unjust enrichment. Thus, the trial court can resolve the matter without IDOR's expertise.

¶ 32        In addition, limiting Arlington Height's recovery to the six-month offset gifts a windfall to Rolling Meadows for its failure to timely report sales tax errors, as provided in section 8-11-6 of the Municipal Code. 65 ILCS 5/8-11-16 (West 2020). That section provides that after the IDOR submits to "each municipality each year a list of those persons within that municipality who are registered with the Department under the Retailers' Occupation Tax Act" "[t]he municipal clerk shall forward any changes or corrections to the list to the Department within 6 months." *Id.* Rolling Meadows was obligated to inform the IDOR within six months that the restaurant was not within its city limits.

¶ 33        The dissent notes that section 8-11-16 of the Municipal Act also provides "[t]he offset amount shall be the amount erroneously disbursed within the previous 6 months from the time a misallocation is discovered." *Id.* Based on this provision, IDOR reimbursed Arlington Heights the misallocated sales tax revenue only from July 2019 to December 2019. According to the dissent, the legislature thus has placed a six month limitation on Arlington Heights's recovery. *Infra* ¶ 48. Assuming the statute refers to when the IDOR discovers the

misallocation, it conflicts with the duty to report an error, thereby encouraging municipalities to conceal errors for years, knowing that the offset amount would be limited to the six months. Moreover, section 8-11-16 places a limit on the recovery IDOR can provide but does not preclude a municipality from also bringing a claim in circuit court to recover the remainder owed. Thus, we reverse the trial court's finding that it lacked jurisdiction.

¶ 34                                    Doctrine of Nonliability

¶ 35        The doctrine of nonliability thwarts a declaratory judgment action when the conduct that makes the party amenable to suit has already occurred. *Adkins Energy, LLC*, 347 Ill. App. 3d at 378. The doctrine usually arises in the context of a breach of contract. As the *Adkins* court explained, "[t]he fact that the amount allegedly owed under a contract is already fixed does not preclude a declaratory judgment action, because a party is not amenable to suit until a breach occurs. Therefore, declaratory judgment could guide future conduct in such a situation because a court could determine whether or not a valid contract exists and, thereby, inform the party that potentially owes the money whether or not it would be in breach of a contract should it refuse to pay." *Id.*

¶ 36        Rolling Meadows contends the doctrine bars Arlington Heights from seeking declaratory relief because the conduct complained of ceased. Rolling Meadows identifies that conduct as IDOR's failure to properly code the Cooper's Hawk restaurant's location, which IDOR has since corrected. We disagree because the wrongful conduct Arlington Heights complains of and for which it seeks declaratory relief is ongoing; Rolling Meadows retains nearly eight years of sales tax allegedly belonging to Arlington Heights. Because the conduct for which Arlington Heights seeks declaratory relief is not in the past but is still occurring, the doctrine of nonliability does not apply and is not grounds for dismissal. See *Brandt Construction. Co. v.*

*Ludwig*, 376 Ill. App. 3d 94, 103 (2007) (doctrine of nonliability did not apply to bar general contractor's declaratory judgment action against director of the Department of Labor seeking a determination as to whether it needed to reimburse employees for amounts owed due to higher wage rate).

¶ 37     Reversed and remanded.

¶ 38     PRESIDING JUSTICE ODEN JOHNSON, dissenting:

¶ 39     I must respectfully dissent. The majority seems to be persuaded by the appellate court case of *Village of Itasca* as opposed to our superseding authority, namely, the supreme court's *City of Chicago* opinion, which did not cite *Village of Itasca* favorably, but found instead that it did not "inform[ ] our decision." *City of Chicago*, 2019 IL 122878, ¶ 27. As I explain below, the most one can say about *Village of Itasca* is that it was not overturned, since its issue would not arise again.

¶ 40     In *City of Chicago*, our supreme court observed that the *Village of Itasca* opinion "relied on the rule in *Employers Mutual Cos. v. Skilling*, 163 Ill. 2d 284 (1994), that the legislature's divestment of circuit court jurisdiction must be explicit." *Id.* In fact, *Village of Itasca* cited *Skilling* 12 times. However, the supreme court noted that that it had already clarified in a prior case that this statement in *Skilling*—upon which *Village of Itasca* relied—was incorrect. The supreme court stated: "[I]n *J&J Ventures* this court clarified that the absence of an explicit divestiture of circuit court jurisdiction is *not* dispositive." (Emphasis added.) *Id.*

¶ 41     After disparaging the basic underpinning of the *Village of Itasca* opinion—namely, *Skilling*—the supreme court "further" distinguished *Village of Itasca*. *Id.* The supreme court further distinguished it by observing that *Village of Itasca* did not concern "the proper distribution of use taxes over a multiyear period," as did the case before it. *Id.* However, this

further distinction does not change the fact that the supreme court did not cite the case favorably to begin with. A better way to describe the supreme court's treatment of *Village of Itasca* would be to say that it declined to extend *Village of Itasca*, where the issue would not rise again.

¶ 42     The jurisdiction issue in *Village of Itasca* would not rise again, due to an explicit statutory section passed after the actions at issue in *Village of Itasca* occurred. Our legislature passed a statutory section specifically forbidding the type of agreement alleged in *Village of Itasca* and giving courts limited jurisdiction if this forbidden agreement still occurred, after the statute's effective date of June 1, 2004. 65 ILCS 5/8-11-21(a) (West 2020). The section forbids a town from entering a sales-tax rebate agreement if the tax, absent the agreement, would have been paid to another town and if the retailer maintained a retail location or warehouse in that other town (*id.*), which was the type of agreement alleged in *Village of Itasca*. This section also provided its own statutory remedy if this type of agreement, nonetheless, occurred. *Id.* Where our legislature granted courts a limited jurisdiction over this brick-and-mortar issue and specified remedy, the supreme court found that this section further supported its conclusion that courts did not generally have jurisdiction over sales-tax issues. *City of Chicago*, 2019 IL 122878, ¶¶ 43-44.

¶ 43     The majority asserts that the "statute says nothing about a municipality suing another municipality." *Supra* ¶ 26. While the statute does not say that it is the exclusive remedy for misallocated sales taxes, the absence of an explicit divestiture of circuit court jurisdiction is not dispositive—as our supreme court already held in *City of Chicago*, 2019 IL 122878, ¶ 27. Plaintiff here argues that it pled equitable claims not subject to statute. However, in *City of Chicago*, the plaintiffs also pled equitable claims in an effort to escape the statutory framework,

but to no avail. *Id.* ¶ 11 (alleging unjust enrichment and seeking imposition of a constructive trust). In *City of Chicago*, defendants argued that "although plaintiffs attempt to cloak their cause of action in the attire of equity, their claims are purely statutory and under the applicable framework the legislature has vested IDOR with the exclusive authority to act." *Id.* ¶ 24.[1] The supreme court agreed, finding that, "[b]ased upon the statutory framework," IDOR had "been vested, for purposes of plaintiffs' claims, with the exclusive authority" to act. *Id.* ¶¶ 39-40.

¶ 44    While the absence of an explicit divesture is not dispositive, a supreme court case is. Our supreme court found that, while the absence of an explicit divesture was not dispositive, "legislative intent to divest circuit courts of jurisdiction may be discerned by considering the statute as a whole." (Internal quotation marks omitted.) *Id.* ¶ 26. Our supreme court did just that and found that the comprehensive statutory framework vested exclusive jurisdiction in IDOR.

¶ 45    It is not only the supreme court case that is stacked against plaintiff. Plaintiff is out of luck on two counts: (1) an Illinois Supreme Court case that is on point, and (2) a statute's express six-month limit on recovery (which plaintiff already received).

¶ 46    Plaintiff argued, and the majority appears to accept, that the *City of Chicago* opinion is distinguishable because it addressed use taxes rather than the sales taxes at issue here. However, the supreme court began its analysis by observing that "[t]his case concerns *two* types of Illinois *** taxes:" sales tax and use tax. (Emphasis added.) *Id.* ¶ 3. Thus, the supreme court clearly said that the case before it involved two types of taxes—not just the one that the majority seeks to limit it to. [2]

---

[1]"[T]here is no dispute that the State has the authority to levy, assess, and collect sales taxes and use taxes, and no counterpart exists at common law." *City of Chicago*, 2019 IL 122878, ¶ 23.
[2]The issue before it was a " 'use tax-sales tax swap.' " *Id.* ¶ 8.

¶ 47     The court considered the statutory framework governing *both* sales and use taxes to reach its conclusion about the misallocated sales taxes that were at the heart of that opinion.[3] In particular, the supreme court considered the elaborate statutory framework governing *IDOR's authority* over both sales and use taxes. *Id.* ¶ 29. Paragraph by paragraph, the supreme court quoted first from ROTA, which governs sales taxes, and then from Use Tax Act, which governs use taxes. *Id.* ¶¶ 30-34 (quoting from ROTA and the Use Tax Act). The supreme court then issued its conclusion. *Id.* ¶¶ 43-45. For a municipality to bring a misallocation suit, it must be given that right by the legislature, and the legislature has permitted suit in only one limited circumstance. *Id.* ¶ 44. A municipality may bring a suit for missourced sales tax "only as a result of a rebate agreement entered after June 1, 2004"—which is not the case here. *Id.* Ergo, plaintiffs may not sue.

¶ 48     The equities have already been weighed, as a policy matter, by our legislature, who determined that a six-month recovery was appropriate. The allocation of resources by the State among municipalities is a policy matter that is best left to the legislature to resolve—which it did. There are equities on the other side that the majority overlooks. The citizens of the receiving municipality counted on this money and it has, most likely, already been spent or, at least, earmarked—begging the question of where this money is going to come from if a return is forced. As the majority notes, the error was due to a " 'municipal clerk.' " *Supra* ¶ 32 (quoting 65 ILCS 5/8-11-16 (West 2020)). Additional taxes on unsuspecting citizens due to a clerical error will not bode well.

---

[3]In *City of Chicago*, the plaintiffs alleged that little or no sales activity took place at the office sites maintained by Internet retailers in Kankakee or Channahon, and that these sites were "maintained for the sole purpose of having the Internet retailers obtain a tax rebate. *City of Chicago*, 2019 IL 122878, ¶ 9. In its complaint, the plaintiffs sought a constructive trust on *all sales tax revenue* received by Kankakee and Channahon as a result of the agreement, and damages in the amount of use tax revenue that the plaintiffs had been wrongfully deprived. *Id.* ¶ 10.

¶ 49    This is not a simple dispute. Plaintiff argues, and the majority appears to accept, that the distinction between use and sales taxes is significant because calculating use taxes is more complex than calculating sales taxes and, hence, it made more sense in *City of Chicago* to defer to an administrative agency with respect to use taxes. Although use tax calculation may be more complex, plaintiff here is still seeking a multi-year calculation with interest. Plaintiff asks the court to calculate eight years of revenue plus interest and to devise, approve, and supervise a payback plan with interest. As in *City of Chicago*, "plaintiff[ ], in essence, [is] seeking to use the circuit court to conduct a full-scale audit and redistribution of state taxes. IDOR has been given that authority by the legislature, not the circuit court." *City of Chicago*, 2019 IL 122878, ¶ 42. Plaintiff knew that IDOR had jurisdiction which is why it went there first. However, the outcome was not to its satisfaction, so it sought a second bite at the proverbial apple in court.

¶ 50    While I have nothing but respect for my colleagues and sympathy for concerns about a windfall, our legislature anticipated this type of error and anticipated that correcting it would pose a big problem if brought to IDOR's attention years later. Hence, the legislature set a limit, for both us and IDOR to abide by. Thus, I must respectfully dissent.

*Village of Arlington Heights v. City of Rolling Meadows*, **2024 IL App (1st) 221729**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 22-CH-1229; the Hon. Thaddeus L. Wilson, Judge, presiding. |
| **Attorneys for Appellant:** | Hart M. Passman and Gregory T. Smith, of Elrod Friedman LLP, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Andrew Y. Acker, of Storino Ramello and Durkin, of Rosemont, for appellee. |